**In re Algernon Mordaunt PETTIT, III and Jean Bengston Pettit, Debtors.**

**Bankruptcy No. 97–8710–3F7.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Aug. 14, 1998.

S. Hunter Malin, Jacksonville, Fl, for George Carter.

James A. Fischette, Jacksonville, Fl, for Debtors.

Aaron R. Cohen, Jacksonville, Fl, trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court upon Amended Objection to Debtors' Exemptions. (Doc. 16.) A hearing was held on June 9, 1998, at which time the Court directed the parties to submit proposed Findings of Fact and Conclusions of Law. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On November 13, 1997 Algernon Pettit ("Pettit") and Jean Pettit ("Mrs. Pettit") filed

a Chapter 7 Bankruptcy Petition. (Doc. 1). On their Bankruptcy Schedules, Debtors claimed exemptions of $23,392.43 in Pettit's Wage Account, $1000 in Debtors' joint checking account, [hereinafter "Operating Account"] and $352,049.06 in Pettit's Prudential Securities IRA/SEP Account. (Doc. 2.)

On January 21, 1998 George Carter ("Carter"), a secured judgment creditor, filed Objection to Debtors' Exemptions. (Doc. 9). On March 31, 1998 Carter filed Amended Objection to Debtors' Exemptions. (Doc. 16). Carter objects to the exemptions for the Wage Account, the Operating Account, and the Prudential Securities IRA/SEP Account. (Doc. 16).

Since January of 1996 Pettit has worked for Mark DeBiase, Inc., doing business as Joint Venture, as a salesperson of orthopedic implants and medical equipment. (Carter's Ex. 49 at 8.) Although there is no written employment agreement between Pettit and Joint Venture, there is a verbal agreement that Pettit is an independent contractor and that he will not compete with Joint Venture as long as Mark DeBiase treats him appropriately. (Carter's Ex. 52 at 22.) Joint Venture does not withhold employment taxes from Pettit's compensation and issues him a 1099 Miscellaneous statement for tax purposes. (Carter's Ex. 52 at 20, Carter's Ex. 49 at 9.) Joint Venture does not provide any benefits such as health insurance, disability insurance, or a pension or profit sharing plan to Pettit. (*Id.* at 12–13.) Joint Venture has no control over the number of hours Pettit works. (Carter's Ex. 50 at 3.) Pettit has no ownership interest in Joint Venture. (Carter's Ex. 49 at 11.)

Pettit's work is structured as follows. He performs sales presentations after which the customer decides whether to purchase the product. (Carter's Ex. 50 at 4.) If the customer purchases the product, the customer informs Pettit where to deliver the product. (*Id.*) If the customer reorders without requesting a second sales presentation, Pettit receives credit for the sale even though he performed no additional work. (*Id.* at 5.) All orders in the Jacksonville area are credited to Pettit whether he or another salesperson takes the order or performs the sales presentation. (*Id.* at 8.) Pettit is paid a $12,500 monthly commission, a $10,000 quarterly bonus, and is reimbursed for business expenses. (Carter's Ex. 49 at 8–9, 13.) From May of 1996 to November of 1997, nine of Pettit's checks included expense reimbursements. (Carter's Ex. 45.)

In May of 1996, Pettit opened the Andy Pettit Wage Account ("Wage Account") into which he deposited his checks from Joint Venture. (Carter's Ex. 49 at 18.) With the exception of the $10,000 bonus check he received on May 2, 1997 and deposited on May 30, 1997, Pettit deposited all of his commission and bonus checks from May of 1996 until November of 1997 no later than 10 days after the date he received them. (Carter's Ex. 45.)

Debtors have a joint checking account ("Operating Account") that is funded primarily by Pettit's Wage Account. (Carter's Ex. 49 at 42–43.) Pettit writes checks made payable to himself from the Wage Account and then deposits them into the Operating Account. (*Id.* at 40–41.) However, on at least one occasion, a deposit for which Debtors have no explanation was made into the Operating Account. (Transcript of 6/09/98 hearing [hereinafter "Tr."] at 43–44.) Debtors' only source of cash is withdrawals from the Operating Account. (Carter's Ex. 49 at 42.)

On November 11, 1997 Pettit received from Joint Venture a $14,042.43 check, $12,500 of which represented his October commission, and $1,542.43 of which represented expense reimbursement. (Carter's Ex. 50 at 50.) On November 13, 1997 the monthly beginning balance in the Wage Account was $306.74. (Carter's Ex. 43.) On that day Debtors made two deposits into the Wage Account. (*Id.*) The first deposit was for $23,042.43. $14,042.43 of the first deposit represented the November 11, 1997 payment. (*Id.*) The second deposit was for $2,000. (*Id.*)

On October 28, 1997 the monthly beginning balance in Debtors' Operating Account was $49.81. (Carter's Ex. 42.) On October 28, 1997 a $4,000 deposit was made. (*Id.*)

On November 6, 1997 a $600 deposit was made. (*Id.*) On November 12, 1997 a $6,000 deposit was made. (*Id.*) On November 13, 1997 a $6000 deposit was made. (*Id.*)

On or about November 23, 1993 Pettit transferred approximately $200,000 from his SEP/IRA account at J.C. Bradford & Co. into a Prudential Securities Account. (Carter's Ex. 49 at 178.) From the inception of the Prudential Account until the date of the Bankruptcy Petition, Pettit made no additional contributions. (*Id.* at 178–180.) The approximate value of the account on the date of Debtors' Petition was $ 352,049.06. (Carter's Ex. 49.)

When Pettit opened his Prudential Securities Account, he completed and was given a copy of a New Client Record and a SEP/IRA Application. (Carter's Ex. 46, Carter's Ex. 50 at 28, 29.) He also signed and was given a copy of a Client Opening Account Agreement and a Disclosure Statement. (*Id.*) Pettit did not receive any other documents. (Carter's Ex. 50 at 29.)

## CONCLUSIONS OF LAW

The first issue in this Case is whether the commissions and bonuses earned by Pettit are exempt pursuant to § 222.11 Florida Statutes. The statute, entitled "Exemption of Wages from Garnishment" provides in pertinent part:

(1) As used in this section the term:

(a) "Earnings" includes compensation paid or payable, in money of a sum certain, for personal services or labor whether denominated as wages, salary, commission or bonus.

(2)(a) All of the disposable earnings of a head of family whose disposable earnings are less than or equal to $500 a week are exempt from attachment or garnishment.

(b) Disposable earnings of a head of family, which are greater than $500 a week, may not be attached or garnished unless

such person has agreed otherwise in writing.

(3) Earnings that are exempt under subsection (2) and are credited or deposited in any financial institution are exempt from attachment or garnishment for 6 months after the earnings are received by the financial institution if the funds can be traced and properly identified as earnings. Commingling of earnings with other funds does not by itself defeat the ability of a head of family to trace earnings.

Fla.Stat.Ann. § 222.11 (West 1998).

There is no dispute as to Pettit's status as head of household. The issue is whether his commissions and bonuses are earnings within the meaning of the statute. The only Florida Supreme Court case to address the issue is *Patten Package Co. v. Houser,* 102 Fla. 603, 136 So. 353 (1931). In *Houser,* the court interpreted the predecessor to § 222.11.[1] The debtor defendant, Houser, delivered petroleum products to Gulf Refining Company, the garnishee. *Id.,* 136 So. at 354. The creditor garnished $ 703.19 owed to Houser. *Id.* Houser claimed that the money owed to him was exempt pursuant to § 222.11. *Id.* Although the court noted that Houser was an independent contractor, its decision that the money owed to him was not exempt was based on the fact that the court was unable to determine how much was attributable to his personal labor or service. *Id.* at 355. The court stated:

The $703.19 was not to come to him as compensation for his personal labor and services. It was to come to him as compensation for delivery of the petroleum products for the Gulf Refining Company, but was to pay the expenses which he had advanced or incurred in and about making such delivery with the net amount left thereafter to be divided equally between himself and his son. Therefore, it was for

---

1. At that time the statute consisted of the following sentence:

No writ of attachment or garnishment or other process shall issue from any of the courts of this state to attach or delay the payment of any money or other thing due to any person who is the head of a family residing in this state, when

the money or other thing due is for the personal labor or services of such person.

*Patten Package Co. v. Houser,* [102 Fla. 603], 136 So. 353 (Fla.1931) (citing to section 3885, Rev. Gen.St.1920, section 5792, Comp.Gen.Laws 1927).

the expense account, for the services of the adult son, and for his services rendered. *Id.*

However, most Florida Bankruptcy courts have interpreted *Houser* to hold that money due for personal labor or services can only be earned by an employee and consequently that the payment of wages to an employee is exempt, whereas compensation to an independent contractor is not. *See In re Montoya,* 77 B.R. 926 (Bankr.M.D.Fla.1987), *In re Moriarty,* 27 B.R. 73 (Bankr.M.D.Fla.1983), *In re Parker,* 147 B.R. 810 (Bankr.M.D.Fla. 1992). *But see In re Glickman,* 126 B.R. 124 (Bankr.M.D.Fla.1991) (holding that payments to head of family for personal labor and services are exempt whether the head of family is an employee or an independent contractor).

In 1993, in *In re Schlein,* the Eleventh Circuit Court of Appeals addressed the issue of whether § 222.11 exempts compensation of independent contractors. *In re Schlein,* 8 F.3d 745 (11th Cir.1993). Schlein conceded that he was an independent contractor but argued that the phrase "money due for personal labor or services" was not limited to earnings of employees. *Id.* at 754. The court disagreed and held that the "earnings" of an independent contractor are not money due for personal labor or services and are thus not exempt pursuant to § 222.11. *Id.* at 755–56. The court based its decision in part on *Refco v. Sarmiento,* 487 So.2d 75 (Fla.3d Dist.Ct.App.1986). *Id.* at 755. Although *Refco* held that the debtor was an employee whose wages were exempt, it interpreted *Houser's* finding that the defendant was an independent contractor to be determinative as to the *Houser* Court's holding. *Id.* at 76. The court stated:

> Since appellee's position as head of a family residing in this state is not disputed, the only issue remaining for our consideration is whether the unpaid commissions owed to appellee were due for his personal labor or services, that is to say whether appellee

was an employee or an independent contractor. *Id.*

The second basis for the *Schlein* decision was the language of the statute. The court pointed out that the statute specifically exempted wages deposited only into a bank account. *Schlein,* 8 F.3d at 756. The Court held that because Schlein's earnings were not wages, they were not exempt pursuant to § 222.11. *Id.*

In October 1993, § 222.11 was amended.[2] The revised statute substitutes the term "earnings" for the language "money or other thing due to any person ... for the personal labor or service of such person." Fla.Stat. Ann. § 222.11 (West 1998). The term earnings is defined as "compensation paid or payable, in money of a sum certain for personal services or labor whether denominated as wages, salary, commission, or bonus." *Id.* Finally, the statute expanded the definition of exempt bank deposits to be synonymous with the definition of earnings. *Id.* Although all of the Florida bankruptcy cases since *Schlein* hold that earnings of independent contractors are not exempt pursuant to § 222.11, only two cases address the effect of the 1993 amendment on the *Schlein* holding.

The first case to address the effect of the 1993 amendment on the *Schlein* holding was *In re Zamora,* 187 B.R. 783 (Bankr.M.D.Fla. 1995). In *Zamora* the Debtor owned a law practice as a sole practitioner. *Id.* at 784. He also owned a marina. *Id.* The court held that cash in bank accounts from Debtor's law practice and marina as well as accounts receivable from his law practice were not exempt earnings pursuant to § 222.11. *Id.* at 785. The court noted that prior case law defining "money or other thing due for personal services" remained applicable under the amended statute, but focused on whether a debtor's activities are essentially a job or in the nature of running a business instead of whether a debtor is labeled an employee or an independent contractor. *Id.* at 784. The court pointed out several factors to determine whether a debtor's compensation is exempt pursuant to § 222.11. *Id.* at 784–85.

---

2. Although the 1993 amendment occurred two months prior to the *Schlein* decision, the court applied the prior statute. Fla.Stat.Ann. § 222.11 (West 1992)

The court noted that in addition to performing personal services for a business, a debtor must receive regular compensation dictated by the terms of an arm's length employment agreement to perform services that are much like a job. *Id.* at 784. The court held that Zamora's cash and accounts receivable were not exempt "earnings" because he was in total control of both businesses, the amount of his compensation, and the terms of his employment. *Id.* at 785. In addition, there was no employment contract between the debtor and his businesses. *Id.* In response to Zamora's argument that distinguishing between business owners and employees violated equal protection, the court stated:

> There are sound reasons for the different treatment. An employee has regular earnings pursuant to an employment agreement. He or she is paid directly for personal labor or services. By contrast, this Debtor and others similarly situated who run their own businesses, have control over the timing and amount of their compensation. Certainly, the legislature did not intend to exempt all funds a person chooses to draw from a business where the individual has full discretion over what expenses to pay or not to pay in order to fund the draw.

*Id.* at 785.

The other case to address the effect of the 1993 amendment on the Schlein holding was *In re Lee*, 190 B.R. 953 (Bankr.M.D.Fla. 1995). In *Lee*, the court held that insurance renewal commissions earned by an independent contractor were not exempt pursuant to § 222.11. *Id.* at 955. Relying upon the first basis of the *Schlein* holding, that only an employee could earn money for personal labor or services, the court stated:

> The legislature did not alter the substantive requirement that exempt earnings must be in the nature of compensation for personal labor or services. Thus, with regard to earnings as opposed to bank accounts, *Schlein* is still controlling with regard to its holding that the exemptions do not extend to earnings of an independent contractor. *Zamora* at 784–785.

*Id.* at 954.

Unlike *Lee*, this court does not interpret *Zamora* to hold that § 222.11 does not extend to earnings of an independent contractor. As previously stated, the *Zamora* court focused on whether a debtor's activities were essentially a job or whether they were in the nature of running a business instead of whether the debtor was labeled an employee or an independent contractor. *Zamora*, 187 B.R. at 785.

This Court agrees with the reasoning of *Zamora* and adopts a totality of the circumstances approach in determining whether a debtor's compensation constitutes exempt earnings pursuant to § 222.11. The Court is unwilling to base its decision solely upon whether a debtor is labeled an employee or an independent contractor. Although Pettit is labeled an independent contractor, his activities are essentially a job and not in the nature of running a business. He receives regular compensation dictated by the terms of arm's length employment agreement, albeit a verbal one. Since he began working for Joint Venture in May of 1996, Pettit has been paid a monthly commission of $12,500 as well as quarterly $10,000 bonuses. Although Pettit's monthly commission and quarterly bonuses are based upon the volume of sales, Mark DeBiase, the owner of Joint Venture, has discretion as to the timing and the amount of Pettit's compensation and may adjust it if he so chooses. Also, Pettit's duties and compensation are dictated by the terms of an arm's length employment agreement. Unlike Zamora, Pettit is not a business insider who is in a position to manipulate his compensation by labeling all cash and accounts receivable wages and then claiming them as exempt in the event of a garnishment or bankruptcy. Pettit is not in a position to obtain draws from Joint Venture. Finally, Pettit has no ownership interest in Joint Venture. In light of the circumstances surrounding Pettit's relationship with Joint Venture, the Court concludes that Pettit's commission and bonuses are exempt earnings pursuant to § 222.11.

### Wage Account

Having found that Pettit's commissions and bonuses are exempt earnings pur-

suant to § 222.11, the Court must now determine what portion of the Wage Account is attributable to his earnings. The statute requires that money in a bank account be traceable and properly identified as earnings in order to be exempt. Fla.Stat.Ann. § 222.11 (West 1998). Federal Rule of Bankruptcy Procedure 4003(c) provides that the objecting party has the burden of proving that exemptions are improperly claimed. Fed.R.Bankr.P. 4003(c) (1998). The party objecting to the exemption has the burden of proving, by a preponderance of the evidence, that the debtor is not entitled to the exemptions claimed. Once the objector has made a prima facie showing that debtor's claimed exemptions should be disallowed, the burden shifts to debtor to prove that the exemptions are legally valid. *In re Wilbur*, 206 B.R. 1002 (Bankr.M.D.Fla.1997).

■ On November 13, 1997, the date of the filing of the Bankruptcy Petition, the balance of the Wage Account was $25,349.17. The balance represents the sum of the beginning monthly balance of $306.74, plus deposits of $23,042.43 and $2,000 made by Pettit on November 13, 1997. Debtors claim an exemption of $23,392.43 pursuant to § 222.11.[3] Debtors contend that the $23,042.43 represents a $14,042.43 check Pettit received on November 11, 1997, $12,500 of which was his October commission, and $1,542.43 of which was an expense reimbursement, along with $9,000 in cash that was lying around his house.[4] The $12,500 came from Joint Venture and was deposited directly into the Wage Account. Because $12,500 of the $23,042.43 deposit can be traced and properly identified as Pettit's earnings, it is exempt. The $1,542.43 expense reimbursement, however, has not been traced and properly identified. Debtor contends that he used his commission or bonuses to initially pay the

expenses and that the expense reimbursement is therefore a repayment of his commission or bonuses. The Court is not convinced that Pettit initially paid the business expense with his commission or bonuses. The Court has no evidence as to when the expense was incurred. Pettit could have paid the business expenses with his credit card or another source of income. The Court is unwilling to make the logical jump that Debtors' explanation requires. Carter's Objection as to the $1,542.43 expense reimbursement will be sustained.

Based on Pettit's conflicting testimony as to the source of the additional $9,000 deposited on November 13, 1997, the Court will sustain that objection. At Pettit's June 8, 1998 deposition, he stated that he could not recall from where the additional $11,000 came. At the trial on the following day, however, Pettit testified that after having thought about the source of the money, he realized for the first time that it was from cash lying around the house. Pettit's practice of contemporaneously depositing the entire amount of his commission and bonus checks into the Wage Account since May of 1996 casts further doubt on his explanation that the cash came from money he had saved from his commission or bonus checks. As Carter points out, Pettit was unable to satisfactorily explain the source of the money or the time period from which the money came.

With respect to Debtors' contention that the November 13, 1997 beginning balance of $ 306.74 is attributable to Pettit's commission or bonuses and is therefore exempt, the Court finds that Debtors have not met their burden of proof. There are several problems with respect to the exemption. First, Joint Venture has repeatedly given Pettit checks that covered both his commission and his

---

3. On their Bankruptcy Schedule C, Debtors claimed an exemption amount of $23,392.43. (Doc. 2). The Court is unclear as to how Debtors calculated the exemption amount. At trial, Debtors' counsel mistakenly informed the Court that the balance in the Wage Account on November 13, 1997 was $360. In fact, the beginning balance was $306.74. But, the difference between the claimed exemption amount and the $23,042.43 deposit is $350, not $360. Nonetheless, the error has no effect on the court's decision.

4. Curiously although Debtor testified that on November 13, 1997 he deposited $ 10,000 in cash that was lying around his house, the original source of which was his compensation from Joint Venture (Tr. At 30.), he only claims $9000 of it as exempt. He does not claim as exempt any portion of the November 13, 1997 $2000 deposit even though his explanation would indicate that at least $1000 of it came from money lying around the house.

expense reimbursement. The Court has already determined that it will sustain Carter's Objection to the expense reimbursement that was deposited into the Wage Account on November 13, 1997. The Court is unwilling to assume that the $306.74 represents Pettit's commission or bonus and not his expense reimbursement. In conclusion, with respect to the Wage Account, the Court will overrule Carter's objection as to $12,500 that represents Pettit's October commission, but will sustain the objection as to the $1,542.43 expense reimbursement, the $9000 included in the November 13, 1997 $23,042.43 deposit, and the beginning balance of $306.74.

### Operating Account

With respect to Debtors' $1000 claimed exemption for the Operating Account, the Court will sustain the objection. The beginning balance in the Operating Account on October 28, 1997 was $49.81. Debtors made deposits on October 28, 1997 of $4,000, on November 6, 1997 of $600, and on November 12, 1997 of $6000. Debtors were unable to identify the source of the $600 deposit made on November 6, 1997. From October 28, 1997 through November 12, 1997, checks totaling $3,709.89 cleared the Operating Account leaving an ending balance of $6,939.92 on November 12, 1997. On November 13, 1997 Debtors deposited an additional $6000 into the Operating Account bringing the account balance to $12,939.92. On November 13, 1997 checks totaling $4191.39 cleared the account leaving a balance of $8,748.53.

Debtors claim a $1000 exemption as to the funds in the Operating Account on the day they filed their Petition. Debtors propose a first in first out method of accounting and contend that the balance of $49.81, the first two deposits of $4000 and $600, and a portion of the November 12 $6000 deposit had been exhausted by the checks clearing the Operating Account. They argue that all that re-

mained on November 13 when they filed their Petition was $2,748.53 of the November 12 deposit and the entire $6000 deposit made on November 13.

■ Although Debtors' argument ensures that none of the unaccounted for $600 deposit remained at the time they filed their Petition, an obstacle to the exemption remains. The Court has already found that only $12,500 of the funds in the Wage Account is exempt. The Court is unwilling to presume that the money that was transferred to the Operating Account from the Wage Account was comprised only of exempt funds. Consequently, the Court will sustain the objection.

### Prudential Securities Account

■ Debtors claim the balance of $ 352,-049.06 in Pettit's Prudential Securities Account as exempt pursuant to § 222.21(a) Florida Statutes which provides that any interest in a retirement or profit sharing plan that is qualified under section 403(a), 403(b), 408 or 409 of the Internal Revenue Code is exempt from all claims of creditors of the beneficiary or participant. Fla.Stat.Ann. § 222.21(2)(a) (West 1998). Section 408 of the Internal Revenue Code sets forth six requirements with which a trust instrument or account must comply to qualify as an individual retirement account ("IRA").[5] 26 U.S.C. § 408 (1998). An account that does not meet all six requirements does not qualify as an IRA, and is thus not exempt pursuant to § 222.21(2)(a).

Carter contends that Pettit's Account is not exempt property because it is not a qualified IRA pursuant to § 408 of the Internal Revenue Code. Carter argues that the governing instrument does not comply with any of the requirements of § 408.

The problem with Carter's argument is that there is no trust instrument in evidence. Carter's evidence with respect to the SEP/IRA consists of a Prudential Securities New

---

**5.** Section 408 of the Internal Revenue Code requires that the written governing instrument that creates the trust (SEP/IRA) contain the following provisions. It must contain a limitation on the amount an individual can contribute. The instrument must indicate that the trustee is a bank. It must indicate that no part of the trust funds will be invested in life insurance contracts. It

must indicate that an individual's interest in the balance of his account is non-forfeitable. It must indicate that the assets of the trust will not be commingled with other property except in a common trust fund. Finally, it must indicate the method of distribution upon the death of the individual for whom the account was set up. 26 U.S.C. § 408 (1998).

Client Record ("New Client Record"), a SEP/ IRA Application ("Application"), a Client Opening Account Agreement ("Client Agreement") and a Disclosure Statement. The New Client Record requests general information such as name, address, marital status, employment status, and amount of assets. The Application requests the name of the account holder, the account number, and the beneficiary. Most importantly, however, is the section in the Application entitled, Participant's Acceptance which reads as follows.

I appoint Prudential Securities Incorporated to serve as Custodian in accordance with the terms and conditions of the Prudential Securities IRA Custodial Account Agreement and hereby acknowledge that I have received and read the Disclosure Statement accompanying it. **This IRA Adoption Agreement contains a pre-dispute arbitration clause found in Article IX Miscellaneous, section 5, Arbitration.**

The Disclosure Statement to which the Participant's Acceptance refers is part of the exhibit and describes the accrual and calculation of interest. However, the IRA Custodial Account Agreement and the IRA Adoption Agreement to which the Participant's Acceptance refers are not in evidence. The possibility exists that one of the two documents is the governing trust instrument.

■ The objecting party has not proven by a preponderance of the evidence that Pettit's Prudential Securities Account does not qualify as an IRA pursuant to § 408, and consequently, that it is not exempt pursuant to § 222.21(a). Carter is correct in his contention that the documents in evidence do not comply with § 408 of the Internal Revenue Code. However, he has not proven that any of the documents in evidence is the trust instrument, or alternatively, that a trust instrument that complies with § 408 of the Internal Revenue Code does not exist. Because Carter has not met his burden as to the IRA/SEP exemption, the objection must be overruled and the exemption allowed.

### CONCLUSION

With respect to the Wage Account the Court will sustain Carter's Objection as to $9000 of the $23,042.43 November 13, 1997

deposit, as to the $1,542.43 expense reimbursement, and as to the $306.74 November 13, 1997 beginning balance. The Court will overrule Carter's Objection to the $12,500 commission. The Court will sustain Carter's Objection to the $1000 exemption for the Operating Account. The Court will overrule Carter's Objection to the exemption for the Prudential Securities SEP/IRA Account.

The Court will address the Objection to the Exemption for Household Goods and Furnishings at an evidentiary hearing on September 3, 1998, at 9:30 a.m. Because Carter presented no argument or evidence with respect to the Objection to the exemption for the 1993 Mercedes, with respect to the Objection to the Valuation of all other Personal Property in Debtors' Schedules, and with respect to the failure to list Katheryne Pettit's IRA Account as an asset, the Court will overrule the Objections to these items.